723 A.2d 100 (1999)
318 N.J. Super. 156
Saul WANETICK, Plaintiff-Respondent,
v.
OCT PARTNERSHIP t/a Gateway Mitsubishi, Glenn Swenson, and Larry Evans, Defendants-Appellants. (Two Cases).
Superior Court of New Jersey, Appellate Division.
Argued January 5, 1999.
Decided February 8, 1999.
*101 Kevin M. McKeon, Collingswood, for defendants-appellants (Marshall, Dennehey, Warner, Coleman & Goggin, attorneys; Mr. McKeon, on the brief).
Ronald L. Lueddeke, Spring Lake, for plaintiff-respondent.
Before Judges LONG, KESTIN and WEFING.
The opinion of the court was delivered by LONG, P.J.A.D.
This appeal[1] arises out of the sale of a 1994 Mitsubishi Galant to plaintiff Saul Wanetick by defendants Gateway Mitsubishi and its employees, Glenn Swenson and Larry Evans. Wanetick filed a complaint in December of 1994, alleging that defendants' tactics in connection with the transaction, including knowing misrepresentations as to the nature of the contract as well as the price, violated the New Jersey Consumer Fraud Act (N.J.S.A. 56:8-l to -91), the Uniform Commercial Code (N.J.S.A. 12A:2-101 to -725) and the Magnuson-Moss Warranty Act (15 U.S.C.A. § 230l to § 2312). The complaint also alleged common law fraud, breach of contract and negligence; and sought compensatory as well as punitive damages. In August of 1995, Wanetick filed an Amended Complaint alleging the same facts, but adding claims for intentional and negligent infliction of emotional distress.
Defendants answered, denying the allegations of the complaint. All claims except those relating to the New Jersey Consumer Fraud Act, breach of contract and common law fraud were dismissed at trial. Plaintiff does not challenge those dismissals. The jury returned a verdict which held defendants liable based upon breach of contract and a violation of the Consumer Fraud Act. No common law fraud was found. The jury awarded compensatory damages in the amount of $7,300. The judge thereafter trebled the damages pursuant to N.J.S.A. 56:8-19 and awarded Wanetick $21,900. She also awarded attorneys' fees totalling $23,648.59. The total award, thus, was $45,548.59.
*102 Defendants appeal, contending that the following errors warrant reversal: the jury instruction as to the Consumer Fraud Act was erroneous in that it did not reveal that treble damages and attorneys' fees would be awarded and because it stated that "the law does not provide for punitive damages on a ... consumer fraud action"; the trial judge improperly admitted parol evidence and complaint letters sent by plaintiff to various agencies of government; and there was insufficient evidence to warrant submitting the common law fraud issue to the jury.

I
We have carefully reviewed this record in light of these contentions and have concluded that our intervention is warranted, but only on the issue of the jury charge on the Consumer Fraud Act. Other than that, there was ample evidence from plaintiff and his wife to submit plaintiff's consumer fraud, breach of contract and common law fraud claims to the jury. They testified that they were told they were buying the car for $13,000 ($7000 down plus $250 a month for 24 months), but were essentially tricked into signing a lease with a $23,000 tab. Ultimately, they paid over $20,000 for the car. To be sure, defendants recounted a markedly different version of the transaction, but plaintiff's version, if believed by the jury, was more than adequate to sustain verdicts in his favor on all counts. Further, as to defendants' particular contention that there was insufficient evidence to submit the common law fraud claim to the jury, we note that in addition to rejecting this claim on its merits, we view the issue as moot in any event because the jury returned a verdict in defendants' favor on this count.
Defendants' parol evidence argument was not raised below and is thus subject to a plain error review under R. 2:10-2. The issue is whether the alleged error was clearly capable of producing an unjust result. Here, it was not. Plaintiff's version of the events, which is what defendants seek to interdict, falls squarely within the exception to the parol evidence rule for evidence which establishes that the execution of the contract was procured by fraud. Filmlife, Inc. v. Mal "Z" Ena, Inc., 251 N.J.Super. 570, 573, 598 A.2d 1234 (App.Div.1991). That was the very purpose of plaintiff's testimony and it was not parol evidence at all.
We agree with defendants that the letters of complaint written by plaintiff had no probative value on any issue in the case. However, because they were not admitted into evidence but merely referred to in passing to recount what steps plaintiff took to remedy the situation, we are satisfied that their mention was, at worst, harmless.

II
We turn finally to the jury instruction on the treble damages and attorneys' fees provision of the Consumer Fraud Act, N.J.S.A. 56:8-19, which provides:
Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction. In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section ... the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.
Treble damages and attorneys' fees are mandatory upon a finding of a violation of the Consumer Fraud Act. Cox v. Sears Roebuck & Co., 138 N.J. 2, 24, 647 A.2d 454 (1994). See Skeer v. EMK Motors, Inc., 187 N.J.Super. 465, 470, 455 A.2d 508 (App.Div.1982). See also Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 275, 390 A.2d 566 (1978) (Pashman, J., concurring) ("... N.J.S.A. 56:8-19 not only sanctions but requires the award of treble damages to a successful plaintiff in an action under the Consumer Fraud Act"). Further, "the treble damages provision of the [Consumer Fraud] Act was intended both to compensate a victim for his loss and in addition provide a punitive recovery." Neveroski v. Blair, 141 N.J.Super. 365, 381, 358 A.2d 473 (App.Div.1976). See *103 also, Daaleman, supra, 77 N.J. at 272, 390 A.2d 566 (finding that the Consumer Fraud Act's treble damages "provision is a punitive measure").
Defendants first contend that the jury should have been given an "ultimate outcome charge," advising it that any verdict in plaintiff's favor would be trebled and that counsel fees would be awarded. This is a question of first impression. Indeed, the notes to Model Jury Charge, Civil § 4.23 on the Consumer Fraud Act state:
As set up, the model charge does not indicate to the jury that damages they may award under the Act are trebled. N.J.S.A. 56:8-19 directs the court to award treble damages.
There are two points of view concerning this approach. The Committee is unaware of any court decision in this State directly on point, and therefore, one can only reason by analogy.
The first viewpoint is based on a line of federal cases. These include Webster Motor Car Co. v. Packard Motor Car Co., 135 F.Supp. 4, 11 (D.D.C.1955); Semke v. Enid Automobile Dealers Ass'n., 456 F.2d 1361, 1370 (10 Cir.1972); and Pollock & Riley, Inc. v. Pearl Brewing Co., 498 F.2d 1240, 1242 (5 Cir.1974). Generally, the rationale against advising the jury about the trebled damages concept is, one, that the implementation of a trebling of damages is a function for the court, not the jury, and therefore no useful purpose is served by communicating that consequence to the jury; and two, the jury might adjust its award downward and, accordingly thwart the purposes underlying the statute.
The second viewpoint reasons from an analogy to the "ultimate outcome charge" directed in Roman v. Mitchell, 82 N.J. 336, 413 A.2d 322 (1980). If the ultimate outcome is to be stated to a jury in a personal injury action, why should juries be treated differently in Consumer Fraud Act cases. Moreover, can it not be said that, by not advising of trebled damages, the jury may be confused since some of the jurors may be aware of the remedy. See also Bordonaro Bros. Theatres, Inc. v. Paramount Pictures, Inc., 203 F.2d 676 (2 Cir.1953), in which it was observed that since the pleading contained a demand for treble damages, it was proper to so advise the jury.
The Committee merely notes that here there is no New Jersey case law on point and the Committee takes no position on the question.
In the seminal ultimate outcome case of Roman v. Mitchell, 82 N.J. 336, 345, 413 A.2d 322 (1980), a 12 year old boy was injured after he was struck by wheels which fell from a passing dump truck as he stood on the shoulder of the New Jersey Turnpike. He sued the truck owner. The jury returned a verdict finding the truck owner 25% negligent and plaintiff 75% negligent. As a result, the verdict was molded under the Comparative Negligence Act (N.J.S.A. 2A:l5-5.l) in favor of defendant because plaintiff was more than 50% at fault. Plaintiff appealed, contending that the jury intended to award him 25% of his damages and that
unless the jury was made aware of the legal effect of its findings as to percentages of negligence, such findings may be premised on an erroneous concept of the law and can result in a molded judgment far different from that intended by the jury.
The Supreme Court agreed and held that
ordinarily, a jury informed of the legal effect of its findings as to percentages of negligence in a comparative negligence trial is better able to fulfill its fact finding function. Hereafter, an ultimate outcome instruction should be given to a jury in such a trial. However, in a complex case involving multiple issues and numerous parties, the trial court, in the exercise of sound discretion, could withhold the instruction if it would tend to mislead or confuse the jury.

[Id. at 346-47, 413 A.2d 322.]
In Fischer v. Canario, 143 N.J. 235, 254, 670 A.2d 516 (1996), the Supreme Court applied the reasoning of Roman to a Scafidi[2] case:
*104 The value of an ultimate outcome charge in lost-chance cases is that it informs the jurors of the effect of their causation apportionment. The charge makes clear to jurors that they are to award full damages, and the trial court will make any necessary adjustments in light of their findings. Without the charge, there is the risk that the jurors will reduce their damage award in light of the apportionment of fault they find as part of their verdict. Then, once the trial court makes the same reduction, the plaintiff would receive an inadequate recovery. When a Scafidi damage-apportionment rule is applicable, an ultimate outcome charge generally should be given.
See also State v. Mejia, 141 N.J. 475, 485, 662 A.2d 308 (1995) ("As we have repeatedly stated, trial courts ... must inform juries of the effect of their findings"); Campo v. Tama, 133 N.J. 123, 140, 627 A.2d 135 (1993) (O'Hern, J., dissenting) ("We have always emphasized that juries must understand the import of their findings."); Chavanne v. Clover Financial Corp., 206 N.J.Super. 72, 80-81, 501 A.2d 1024 (App.Div.1985) (explaining that ultimate outcome charge should be used to inform the jury of the fact that its award to a child will be subject to the court's control until the child reaches age of maturity if it has heard evidence that the parents would squander the money); Dimogerondakis v. Dimogerondakis, 197 N.J.Super. 518, 523, 485 A.2d 338 (Law Div. 1984) (holding that ultimate outcome charge, which would inform jury that any damages awarded to plaintiff in personal injury action would be molded to reflect only that percentage of liability which jury attributes to non-settling defendant, was warranted).
In 1996, we again addressed the issue of the need for an ultimate outcome charge in Weiss v. Goldfarb, 295 N.J.Super. 212, 684 A.2d 994 (App.Div.1996). The question presented was whether such a charge should be given to a jury concerning the $10,000 statutory limitation on a hospital's liability. N.J.S.A. 2A:53A-8. In Weiss, the representative of a patient who died after suffering a heart attack brought a medical malpractice action against the hospital, doctors and nurses. The jury awarded plaintiff $150,000 against the hospital. Prior to trial, two doctors and a nurse were dismissed and the jury returned a no cause verdict against the remaining defendants. Plaintiff appealed, claiming that the trial judge erred in refusing to instruct the jury that the hospital's liability was limited to $10,000 under the Immunity Act. We determined that the plaintiff was entitled to an ultimate outcome charge:
We see no fundamental jurisprudential difference between Roman and Fischer on the one hand and this case on the other. The underlying issue is the same, namely, how the jury's damages award, as a matter of substantive law, will translate into the plaintiff's right to recover it.
We reject the argument that a jury's knowing about the statutory limit on a hospital's liability is akin to its knowing whether or not a defendant is insured. Insurance goes to the question of whether a plaintiff, as a matter of fact, will be able to collect the damages the jury has awarded. The statutory limit on a hospital's liability, like comparative negligence and Scafidi apportionments, goes, however, to the issue of plaintiff's legal right to recover the damages awarded. It implicates, in Roman terms, a "legal effect of [the jury's] findings." That is to say, there is a critical difference in the ultimate-outcome context between the question of whether a plaintiff will be able, because of defendant's resources, to obtain satisfaction of the judgment in his favor and the question of how much of that judgment plaintiff is entitled by law to have satisfied. We are further of the view that a clear barometer of whether a consequence of a jury's finding on damages is legal or factual is whether the judge must mold the verdict taking that finding into account. The verdict must be so molded in comparative negligence and Scafidi cases. It had to be so molded here to relieve the hospital of responsibility beyond its statutory liability. Obviously, however, the question of whether *105 a defendant is insured or is otherwise able to satisfy a judgment he is obliged to pay is hardly a "molding" issue.
With respect to the "sympathy" factor that defendants fear, we say only this. Our entire system for the administration of justice is built upon our trust in the jury system and our abiding confidence that juries act conscientiously and diligently in following the instructions given them by the judge. We trust juries to find all kinds of factsthe life and death issues as well as the full range of less consequential ones. Our jurisprudence is committed to the proposition that juries can and will follow the judge's charge and will do so best if they understand the legal consequences of their findings. A jury's potential passion and prejudice that may favor one or the other of the parties can most effectively be averted by cautionary instructions accompanying a charge that tells it fully and correctly how the law will affect its findings of fact.

[Id. at 231-32, 684 A.2d 994.]
The Supreme Court did not agree with us, Weiss v. Goldfarb, 154 N.J. 468, 713 A.2d 427 (1998), and held that the values which informed Roman v. Mitchell were not present in Weiss. In Roman and its progeny, the charge was necessary, according to the Supreme Court, to resolve factual issues concerning statutory damages. In other words, "the statutory damages were placed before the jury because that information was essential to the jury's fact-finding role." Weiss, supra, 154 N.J. at 474-75, 713 A.2d 427. However, "[i]n the present case, the statutory damages are irrelevant to the jury's role." Id. at 475, 713 A.2d 427.
The Court approved of Roman, but in a limited factual situation, explaining that "the Roman decision was appropriate under New Jersey's modified comparative negligence statute because in order to make an informed apportionment of fault, the jury needed to know that plaintiff would not recover if that plaintiff was determined to be more negligent than a defendant from whom recovery was sought." Id. at 477, 713 A.2d 427. Likewise, the Court approved of the application of Roman in Fischer "so that the jury would know the legal effect of causation." Id. at 478, 713 A.2d 427. However, it concluded that advising the jury of the limits on a hospital's liability is analogous to a reference to insurance coverage which improperly focuses the jury's attention on the whether or not the verdict will be collected:
In view of the foregoing legal principles, an ultimate outcome charge, based on the Charitable Immunity Act, in a negligence suit against a hospital is not only irrelevant but has the clear potential of being highly prejudicial. We are convinced that the prejudicial effect of such an instruction could be to shift to other defendants some percentage of negligence that the jury thought should rightfully be assessed against the hospital. We find persuasive the hospital's argument that informing a jury about a hospital's limited liability is akin to telling a jury whether a defendant is insured and the amount of coverage and is at least as prejudicial as telling it about insurance coverage. Such a prejudicial effect would be the antithesis of what Roman and Fischer anticipated. Informing a jury of the liability cap also violates the legislative policy expressed in the Charitable Immunity Act of protecting nonprofit hospitals and the Legislature's desire to withhold from juries the existence of statutory limits on monetary awards.

[Id. at 481-82, 713 A.2d 427.]
We are bound by the distinction the Supreme Court drew between Roman and Fischer on the one hand and Weiss on the other. So bound, we have concluded that the evils the court in Weiss perceived as flowing from revealing the hospital's liability cap to the jury are absent in this case and that, as in Roman and Fischer, an ultimate outcome charge is necessary here to aid the jury in its fact-finding role.
The pivotal evil identified in Weiss was that an ultimate outcome instruction revealing a hospital's liability cap is analogous to telling the jury about insurance coverage available to pay the verdict. That evil is wholly absent here. The punitive damages element of the Consumer Fraud Act has nothing to do with whether there is a pocket out of which a judgment may be satisfied. *106 As such, advising the jury of it does not inject an inappropriate consideration into the jury's fact-finding job. On the contrary, a consumer fraud ultimate outcome charge is a proper consideration for the jury.
In enacting the Consumer Fraud Act, the Legislature, presumably reflecting the contemporary morality of our citizens, recognized that fraud in the marketplace is particularly pernicious because of the wide disparity between the bargaining power of the merchant and the consumer. As a result, it built into its remedy a punitive damages component via treble damages and attorneys' fees. It is fair to say that this sense of outrage over marketplace fraud is potentially present in every case in which a Consumer Fraud Act violation is alleged. Thus, jurors, like the Legislature, may well believe that something more than making the consumer whole is warranted. It is important therefore for the jury to know that its purely compensatory award will trigger an automatic punitive remedy. This will insure that the jury's sense of outrage will not be reflected either in its assessment of compensation or in some other aspect of the case. Indeed, it has no relationship to the fear expressed in Weiss that revealing the hospital's liability cap would shift to other defendants some percentage of negligence that the jury thought should rightfully be assessed against the hospital.
A Consumer Fraud Act case is the other side of the coin. Telling the jury that, upon its finding that the Consumer Fraud Act was violated, the judge will automatically award punitive damages by trebling the verdict and granting counsel fees provides absolutely no incentive to allocate responsibility to any party except the one the jury believes to be at fault. Indeed, letting the jury know that punitive damages will be imposed upon its finding of a violation of the Consumer Fraud Act, operates to prevent a jury from inflating the compensatory award or awarding punitive damages on another count to make its outrage known. We think the punitive aspect of the Consumer Fraud Act is necessary information for the jury to have in executing its function. Thus, we hold that the case is governed by the principles enunciated in Roman and that the trial judge erred by refusing to give the ultimate outcome charge.
Whether the error is reversible is a closer question because the jury did not appear to inflate the compensatory award and, though given the opportunity to impose punitive damages on another count, did not do so. We need not grapple with the effect of omitting the instruction however, because the trial judge made an additional reversible error in the charge. She said:
Punitive damages are awarded in connection with the plaintiff's fraud claim only. The law does not provide for punitive damages on a breach of contract or consumer fraud action.
While we are fully cognizant of what the trial judge was attempting to convey, the words she used inadvertently left the jury with a misimpression as to the law. Neveroski, supra, 141 N.J.Super. at 381, 358 A.2d at 481. As we have indicated, two-thirds of a treble damages award is, in fact, punitive. Thus, it is not fair to say that the law does not provide for punitive damages in a consumer fraud case. Whether this misimpression affected the jury verdict is not something we can be sure of. Because of this, we reverse and remand for a new trial on the consumer fraud count of the complaint.
Affirmed in part; reversed and remanded in part.
NOTES
[1] Defendants filed two notices of appealone after the jury verdict and another, raising identical issues, after the entry of judgment. Although two docket numbers were assigned, only one appeal is before us.
[2] Scafidi v. Seiler, 119 N.J. 93, 574 A.2d 398 (1990), holding that where negligent medical treatment is found to have increased the risk of harm posed to the patient by a pre-existing condition, the jury must determine, on a percentage basis, the extent to which the ultimate result is attributable to the pre-existing condition and the extent to which it is attributable to the patient's lost chance for continued life.